UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MARY K. LONGO,                        )
                                      )
                Plaintiff,            )
                                      )
        v.                            )    No.  4:06CV852 HEA
                                      )                   (FRB)
JO ANNE B. BARNHART,[1] Commissioner  )
of Social Security,                   )
                                      )
                Defendant.            )

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

        This cause is on appeal for review of an adverse ruling
by the Social Security Administration.  All pretrial matters were
referred to the undersigned United States Magistrate Judge pursuant
to 28 U.S.C. § 636(b) for appropriate disposition.

**I. Procedural History**

        On March 26, 2003, plaintiff Mary K. Longo[2] filed an
application for Supplemental Security Income (SSI) pursuant to
Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq.,
in which she claimed that she became disabled on September 1, 1971.
(Tr. 95-97.)  On April 9, 2003, plaintiff filed an application for

---

[1]Michael J. Astrue became Commissioner of Social Security on
February 12, 2007.  Pursuant to Rule 25(d)(1) of the Federal Rules
of Civil Procedure, Michael J. Astrue should be substituted,
therefore, for Former Commissioner Jo Anne B. Barnhart as defendant
in this cause.

[2]At the time plaintiff filed the instant applications, she was
married and proceeded under her married name, "Mary K. Rich."
Plaintiff's marriage has since been dissolved and plaintiff
currently proceeds under her maiden name, "Longo."  (Tr. 138-39.)

Disability Insurance Benefits (DIB) pursuant to Title II, 42 U.S.C. §§ 401, et seq., in which she claimed that she became unable to work on account of her disability on October 23, 2001. (Tr. 154-56.) On initial consideration (Tr. 90-94, 102, 133-37), and on reconsideration (Tr. 81-85, 99, 127-31), the Social Security Administration denied plaintiff's applications for benefits.

On November 18, 2004, a hearing was held before an Administrative Law Judge (ALJ). (Tr. 26-73.) Plaintiff testified and was represented by counsel. A vocational expert also testified at the hearing. A caseworker from Comtrea was also present at the hearing on plaintiff's behalf but did not testify. On July 29, 2005, the ALJ issued a decision denying plaintiff's claims for benefits. (Tr. 12-25.) On March 29, 2006, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 5-8.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  Plaintiff's Testimony

At the hearing on November 18, 2004, plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff testified that she is divorced and has three adult children, all of whom live in California. (Tr. 31.) Plaintiff testified that she quit school when she was sixteen years of age. Plaintiff testified that she was in the sixth grade at the time, had been held back a number of years, could not read or spell, and did not understand what was going on. (Tr. 32.)

Plaintiff testified that she received no training or education after she left school.  (Tr. 33.)

Plaintiff testified that she last worked in February 2000 and left that job because she had to move in with her son and did not have a driver's license or a car that she could take to and from work.  (Tr. 33.)  Plaintiff testified that prior to this work, she was employed at Riverside Haven, a resident nursing home, but had difficulty reading instructions as to what was needed by the residents.  Plaintiff testified that she also had difficulty with transportation with this employment and was terminated when her employer learned that she was trying to find a job closer to home. (Tr. 34.)  Plaintiff testified that she also worked as a cashier at Chevron but was terminated when she did not justify her voids. Plaintiff testified that she could not complete the paperwork required to justify voids because she could not spell.  (Tr. 34-35.)  Plaintiff testified that she currently is unable to work full time because of her emotional instability, inability to read, and arthritis.  (Tr. 35.)

Plaintiff testified that she does not read well and that she has difficulty writing a letter.  Plaintiff testified that when she writes a letter, she writes it her way and then explains it to the recipient before she gives the letter to them.  Plaintiff testified that when she receives a letter, she waits for her caseworker to go over it with her.  (Tr. 31.)  Plaintiff testified that her daughter completed job applications for plaintiff's previous employment positions and, on one occasion, took a test for

plaintiff before plaintiff was hired at the nursing home. (Tr. 35.) Plaintiff testified that she currently lives in a house with her uncle and grandmother, but that she receives no help from them with her daily activities. (Tr. 29-30.) Plaintiff testified that she has never been able to drive. (Tr. 35.) Plaintiff testified that she took the written portion of the driving examination in 2000 by having it read to her, but that she flunked the exam. Plaintiff testified that she later passed the written portion in 2002, but that she did so by peeking in her notebook during the examination while the examiner was not looking. Plaintiff testified that she never took the driving portion of the examination. (Tr. 63.) Plaintiff testified that her caseworker helps her get to places. (Tr. 29-30.) Plaintiff testified that she receives no other help and that if she is unable to perform a task, it just does not get done. (Tr. 31.)

Plaintiff testified that she experiences pain in her lower back four days a week and that the pain is primarily constant when she has it. Plaintiff testified that bending worsens the pain and that nothing really helps to relieve the pain. (Tr. 37.) Plaintiff testified that she experiences intermittent pain in her left shoulder approximately fifteen days a month and that the pain sometimes awakens her. Plaintiff testified that pain medication somewhat relieves the pain, but not completely. (Tr. 38, 55-56.) Plaintiff testified that she experiences pain in both legs nearly every other day but sometimes experiences the pain for days at a time. Plaintiff testified that her doctor has advised her to

elevate her legs during such episodes but that doing so does not provide relief. (Tr. 38-39.) Plaintiff testified that she has had MRI's and x-rays taken of her back, shoulder and legs, but that her physician lost the results. (Tr. 53-55.) Plaintiff testified that she regularly takes her medication, but that it causes her to become sleepy. (Tr. 39.) Plaintiff testified that she sometimes accidentally takes more medication than what is prescribed. (Tr. 48.)

Plaintiff testified that her legs and back hurt if she sits for longer than one hour. (Tr. 35.) Plaintiff testified that she can stand for fifteen to thirty minutes and can walk for half-an-hour. Plaintiff testified that she is able to go up and down steps. Plaintiff testified that she is able to bend over at the waist to pick something up from the floor but cannot stoop, crouch or squat. Plaintiff testified that she can lift a gallon of milk with her right hand, but not with her left hand because of problems with her shoulder. (Tr. 36.) Plaintiff testified that she cannot lift her left hand above her head and that her physician instructed her in 2001 not to lift over five pounds. (Tr. 37, 56.)

Plaintiff testified that she has crying spells every day and that she experiences nightmares that awaken her. Plaintiff testified that she sees a psychiatrist every four weeks. (Tr. 44.) Plaintiff testified that she sometimes has difficulty making decisions such as what to fix for dinner or what to wear because she does not care anymore and has no motivation. Plaintiff testified that she sometimes has problems with anxiety depending on

the situation she is facing at the time. (Tr. 45-46.) Plaintiff testified that she attempted suicide three years prior by overdosing on pain medication. (Tr. 49.) Plaintiff testified that she was hospitalized as a result but only overnight. (Tr. 49, 51.) Plaintiff testified that she has seen her family physician and a psychiatrist for her mental condition, and has been prescribed Effexor. (Tr. 50-52.)

As to her daily activities, plaintiff testified that she goes to bed at 8:30 p.m. and wakes between 5:30 and 6:00 a.m. Plaintiff testified that she awakes feeling rested about two days a week. Plaintiff testified that she cooks breakfast, such as bacon, eggs and sausage; and cooks dinner, such as chicken and dumplings and fried chicken. Plaintiff testified that she prepares dinner every night, but that on some nights she prepares only sandwiches. Plaintiff testified that she has difficulty cooking if it requires reading. (Tr. 40.) Plaintiff testified that she spends most of her time sitting, thinking and watching television. (Tr. 42.) Plaintiff testified that she can watch a half-hour program and understand it from beginning to end, but is unable to do the same with a movie. (Tr. 43.) Plaintiff testified that she goes to the grocery store once a month when someone gives her a ride. Plaintiff testified that her only difficulty is with carrying the groceries but that the person with whom she rides usually helps her. Plaintiff testified that she does the dishes and performs housework such as dusting, vacuuming and sweeping only when it is needed. Plaintiff testified that vacuuming causes pain

in her back. Plaintiff testified that she does her own laundry, but that she sometimes has problems bending over the washing machine. (Tr. 41.) Plaintiff testified that she can care for her personal needs when she chooses to do so. (Tr. 42.) Plaintiff testified that she talks to a friend on the telephone once or twice a week. (Tr. 43.) Plaintiff testified that she used to cross-stitch and crochet throughout the day, but that she has been unable to do such activities for approximately one month. (Tr. 59-60.) Plaintiff testified that she does not date or go to church. (Tr. 43.) Plaintiff testified that she does not belong to any kind of organized group, including group counseling, because she does not want to be around a lot of people. (Tr. 58.)

Plaintiff testified that she had a checking account when she was married but has never had a bank account on her own. (Tr. 41.) Plaintiff testified that she is able to pay her own bills but has difficulty independently spelling the words necessary to complete a check. (Tr. 42.) Plaintiff testified that her daughter helps her balance the checkbook. (Tr. 57.)

B.  Testimony of Vocational Expert

Dr. John Grenfell, a vocational expert, testified at the hearing. The ALJ asked Dr. Grenfell to assume an individual of plaintiff's age, education, training, and past relevant work, with borderline intellectual functioning. The ALJ asked Dr. Grenfell to assume such a person

> were limited to simple, repetitive low stress
> work, with no requirement to do any more than
> very simple reading or writing. If the

- 7 -

> individual were limited to lifting and
> carrying no more than a gallon of milk with
> the right hand, and no more than five pounds
> with the left hand. If the individual would
> need an alternate sit/stand option with no
> regular or frequent bending, stooping, or
> squatting. No extensive stair climbing or
> descending.

(Tr. 64.)

Given these restrictions, Dr. Grenfell testified that such a person would be able to perform plaintiff's past relevant work as a cashier at a self-service gas station. The ALJ then asked Dr. Grenfell to further assume that such a person had IQ scores of verbal-65, performance-73 and full scale-65, to which Dr. Grenfell responded that he would assume such a person to have had the same IQ scores while previously working as a cashier, and thus that such a person would not be prevented from continuing in such employment. (Tr. 65.) Dr. Grenfell further testified, however, that if such a person were limited to no public contact, she would be unable to perform such work or any other work. (Tr. 66-68.)

The ALJ then asked Dr. Grenfell to further assume that such a person had been diagnosed with depressive disorder-NOS and anxiety disorder, with a GAF[3] of 45. Dr. Grenfell testified that such conditions would preclude the performance of all jobs. (Tr. 65-66.)

Dr. Grenfell was asked to assume the individual from the first hypothetical, that such person was limited to no public contact, but that such person was not restricted to work with a

[3]Global Assessment of Functioning.

- 8 -

sit/stand option. Dr. Grenfell testified that this person could perform sedentary, unskilled inspection jobs, of which 800 exist in the State of Missouri and 40,000 nationally. Dr. Grenfell further testified that such a person could also perform simple assembly, of which 4,600 such jobs exist in the State of Missouri and 160,000 nationally. (Tr. 68.) Dr. Grenfell testified that moderate restrictions in the individual's activities of daily living, social functioning and maintaining concentration, persistence and pace would not affect her ability to perform such unskilled sedentary work. (Tr. 68-69.)

### III.  Medical Records

On a date unknown, Dr. Donna Holscher of the Lassen Medical Group in Red Bluff, California, instructed plaintiff not to return to work at Best Western until November 3, 1998, on account of her asthma which was exacerbated by her work environment. Plaintiff was further instructed to work in an area other than laundry and to avoid strong chemicals. (Tr. 429.) On March 2, 1999, Dr. Holscher instructed plaintiff that she could return to work at Best Sweets Inn on March 5, 1999, but was to have no exposure to chemicals or dust. (Tr. 428.)

Plaintiff visited Dr. Holscher on July 24, 2000. (Tr. 408-10.) Dr. Holscher noted plaintiff's medications to include

Nasacort,[4] Xanax,[5] Albuterol inhaler,[6] Flovent,[7] Plendil,[8] and Singulair.[9] Dr. Holscher noted plaintiff's medical problems to include asthma, anxiety and obesity. It was noted that plaintiff had run out of her medications and was waiting for a Medi-Cal card. Dr. Holscher noted plaintiff's anxiety to have been somewhat exacerbated by recent court proceedings, but that plaintiff felt a bit more resolved inasmuch as she has been reunited with her daughter. It was noted that plaintiff took Xanax for her anxiety attacks. Plaintiff expressed a desire to restart Paxil when she can afford other medications. Upon physical examination, Dr. Holscher diagnosed plaintiff with asthma, under fair control; hypertension, not under good control; and anxiety, under fair control. Samples of Plendil were given for plaintiff's hypertension. Dr. Holscher noted that she would attempt to add an

---

[4]Nasacort is indicated for the treatment of the nasal symptoms of seasonal and perennial allergic rhinitis. Physicians Desk Reference 719 (55th ed. 2001).

[5]Xanax is indicated for the management of anxiety disorder or the short-term relief of symptoms of anxiety. Physicians' Desk Reference 2650 (55th ed. 2001).

[6]Albuterol is indicated for the prevention and relief of bronchospasm in patients with reversible obstructive airway disease. Physicians' Desk Reference 2922 (55th ed. 2001).

[7]Flovent is a corticosteroid used to prevent difficulty breathing, chest tightness, wheezing, and coughing caused by asthma. Medline Plus (revised Mar. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601056.html>.

[8]Plendil is indicated for the treatment of hypertension. Physicians' Desk Reference 585 (55th ed. 2001).

[9]Singulair is indicated for the prophylaxis and chronic treatment of asthma. Physicians' Desk Reference 2020 (55th ed. 2001).

antidepressant to plaintiff's medication regimen. (Tr. 408.)

Plaintiff returned to Dr. Holscher on August 24, 2000, for follow up. (Tr. 406-07.) Plaintiff's asthma was noted to be stable. Plaintiff's anxiety and depression were noted to be fair. Plaintiff's hypertension was noted to be under fair control. Plaintiff was instructed to continue with her current medications. (Tr. 406.)

On October 10, 2000, plaintiff returned to Dr. Holscher's office and complained of experiencing left hip pain for two weeks. (Tr. 404-05.) It was noted that plaintiff had no history of low back problems. Plaintiff reported that the pain awakens her at night and that she takes ibuprofen for the pain but with no relief. Physical examination showed normal range of motion, both active and passive. Pain was noted over the iliac crest on the left side. Plaintiff was diagnosed with left hip pain, etiology unknown, and was given Tolmetin.[10] (Tr. 404.)

On October 11, 2000, x-rays taken of plaintiff's hips and pelvis in response to her complaints of pain showed mild degenerative changes. (Tr. 419.)

Plaintiff returned to Dr. Holscher on November 7, 2000, and reported that her hip pain was improving. Plaintiff also reported that she experiences anxiety only with issues involving her husband. Plaintiff's asthma was noted to be stable and plaintiff's hypertension was noted to be under good control.

---

[10]Tolmetin is indicated for the relief of signs and symptoms of rheumatoid arthritis and osteoarthritis. Physicians' Desk Reference 2390 (55th ed. 2001).

Plaintiff was encouraged to discontinue smoking.  Dr. Holscher cleared plaintiff to work with disabled adults but restricted her to no lifting.  (Tr. 403.)

Plaintiff returned to Dr. Holscher on November 28, 2000, for follow up.  Dr. Holscher noted plaintiff's asthma to be under "really good control" and her anxiety to be well controlled with medication.  It was noted that plaintiff had a job, was exercising and was out socially.  Dr. Holscher noted plaintiff to have some reactive grief to changes in her life, but that she seemed to be handling it relatively well and had good social support.  Plaintiff's hypertension was noted to be well controlled as was plaintiff's hip pain with medication.  (Tr. 401.)

On December 18, 2000, plaintiff returned to Dr. Holscher for follow up.  Plaintiff complained of decreased memory and concentration and reported that during the previous week she was tearful, irritable, angry, had trouble falling asleep, and had suicidal ideations.  Dr. Holscher diagnosed plaintiff with depression with grief.  Plaintiff was prescribed Celexa[11] and Ambien[12] and was referred to Mental Health.  (Tr. 400.)

Plaintiff visited Dr. Holscher's office on April 10, 2001, and requested treatment for allergies.  Plaintiff also requested a refill of Elavil which she discontinued when her Medi-Cal was discontinued.  Plaintiff asked if she could be considered

_____

[11]Celexa is indicated for the treatment of depression. Physicians' Desk Reference 1258 (55th ed. 2001).

[12]Ambien is indicated for the short-term treatment of insomnia. Physicians' Desk Reference 2974 (55th ed. 2001).

disabled due to depression. Plaintiff was diagnosed with depression and seasonal allergies and was prescribed Kenalog[13] and Triavil.[14] (Tr. 399.)

On May 17, 2001, Dr. Holscher noted plaintiff to be feeling depressed with a poor mood and difficulty sleeping. Dr. Holscher noted plaintiff to be doing a bit better overall. It was noted that plaintiff had a job at Chevron and was able to walk to work. Plaintiff was open to attending therapy, but it was noted that she had no transportation. Dr. Holscher noted plaintiff to continue to have some mild low back pain for which she took Tylenol #3. Dr. Holscher noted plaintiff's current medications to be Elavil,[15] Celexa, Ambien, Midrin,[16] Azmacort,[17] Vioxx,[18] Singulair, Flovent, Plendil, and Xanax. Plaintiff was diagnosed with allergic rhinitis for which Claritin was prescribed. Plaintiff was also

---

[13]Kenalog relieves inflammation and is used to treat certain forms of arthritis, severe allergies, and asthma. Medline Plus (last revised Apr. 1, 2003)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601122.html>.

[14]Triavil is use to treat depression, anxiety and agitation. Medline Plus (last revised Apr. 1, 2003)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601016.html>.

[15]Elavil is used for the relief of symptoms of depression. Physicians' Desk Reference 626 (55th ed. 2001).

[16]Midrin is indicated for relief of tension and vascular headaches, and possibly for migraine headaches. Physicians' Desk Reference 1077-78 (55th ed. 2001).

[17]Azmacort is indicated in the maintenance and treatment of asthma as prophylactic therapy. Physicians' Desk Reference 690 (55th ed. 2001).

[18]Vioxx is indicated for the relief of signs and symptoms of osteoarthritis and for the management of acute pain. Physicians' Desk Reference 2049-50 (55th ed. 2001).

diagnosed with depression for which plaintiff was instructed to continue with Celexa. It was noted that plaintiff was given ten minutes of psychotherapy. (Tr. 397.)

Plaintiff returned to Dr. Holscher on May 30, 2001, and complained that her right shoulder had been very sore for five days. It was noted that plaintiff had been lifting ice buckets. It was also noted that plaintiff previously worked in a rest home where she had done some lifting. (Tr. 395.) On June 6, 2001, plaintiff continued to complain of right shoulder pain. Plaintiff was instructed to take Vioxx and physical therapy was considered. (Tr. 394.) Plaintiff was provided a sling and was instructed to take Tylenol #3 for pain. (Tr. 391.) X-rays taken of plaintiff's right shoulder on June 7, 2001, showed a tiny amount of calcification about the attachment of the rotator cuff. No fractures or bony destructive lesions were noted. (Tr. 417.) X-rays taken of plaintiff's cervical spine in response to her complaints of shooting pain were unremarkable. (Tr. 416.)

On June 8, 2001, Dr. Holscher noted plaintiff's right shoulder to be "more normal," and rotation of the shoulder was noted to be within normal limits. Plaintiff was wearing a sling. Plaintiff was diagnosed with right shoulder strain. Plaintiff reported that Tylenol #3 was ineffective and that she would take over-the-counter ibuprofen. (Tr. 392.)

On June 28, 2001, plaintiff reported to Dr. Holscher that the pain in her right shoulder had worsened and that she was experiencing tingling to her fingers on the right side. It was

noted that plaintiff continued to lift at work but that she wants to continue with her job. Physical examination showed tenderness over the supraspinous and the trapezius. Range of motion was normal about the neck and shoulder. Plaintiff was diagnosed with right trapezius and supraspinatus strain. Plaintiff was instructed to take Tolmetin and Tylenol #3 and to go to physical therapy. (Tr. 389, 390.) Plaintiff was also instructed to continue with modified work until July 23, 2001. (Tr. 389.) With respect to plaintiff's mental condition, Dr. Holscher noted plaintiff's mood to be better. Plaintiff was less tearful, less irritable and had no suicidal ideation. It was noted that plaintiff felt hopeless at times but that she felt better overall. Plaintiff's medications were refilled. (Tr. 388.)

Plaintiff was admitted to the emergency room at Mercy Medical Center on September 9, 2001, as a result of an overdose. (Tr. 436-47.) Plaintiff reported that she had been depressed and did not feel that she could "handle it." It was reported that plaintiff drank alcohol that evening, smoked marijuana, and took excessive dosages of Xanax and Tylenol #3. (Tr. 436.) No other complaints were present and physical examination was unremarkable. (Tr. 436-37.) Plaintiff was given charcoal and Sorbitol. Dr. Robert Duvoisin felt plaintiff was doing quite well and discharged her to Mental Health. (Tr. 437.)

Plaintiff visited Dr. Holscher on January 10, 2002, who noted plaintiff to be angry and tearful but not suicidal. Plaintiff reported that she was experiencing social stressors with

her son and his wife, with whom she was living.  It was noted that plaintiff liked her job but lost it.  Dr. Holscher noted plaintiff to be experiencing depressive symptoms, including hopelessness, anger, tearfulness, poor memory, and poor concentration.  Plaintiff reported that Celexa was not working for her.  Plaintiff was diagnosed with depression, which was not well controlled.  Dr. Holscher noted plaintiff to have some psychotic features with her depression.  Plaintiff was prescribed Effexor[19] and Risperdal.[20]  It was also noted that plaintiff recently tripped and aggravated her right rotator cuff injury.  Plaintiff was given Vicodin[21] and was instructed to continue with ibuprofen, ice, heat, and exercises. (Tr. 384-85, 386.)

On February 11, 2002, Dr. Holscher noted plaintiff's depressive symptoms to have improved with medication.  Plaintiff denied any hallucinations and no mania or psychotic features were present.  Plaintiff complained of discoloration and coolness in the left foot.  (Tr. 382.)

On March 11, 2002, Dr. Holscher noted that plaintiff's depression and anxiety had "been good."  Plaintiff's paranoid ideation was noted to be fair.  Plaintiff reported Risperdal to be causing odd dreams.  Plaintiff continued to complain of coolness

---

[19]Effexor is indicated for the treatment of depression. Physicians' Desk Reference 3361 (55th ed. 2001).

[20]Risperdal is indicated for the management of the manifestations of psychotic disorders.  Physicians' Desk Reference 1453-54 (54th ed. 2000).

[21]Vicodin is indicated for the relief of moderate to moderately severe pain.  Physicians' Desk Reference 1629-30 (55th ed. 2001).

and throbbing of the left foot.  (Tr. 380.)

On March 14, 2002, plaintiff underwent lower extremity arterial study at Redding Medical Center in response to her complaints of claudication and toe discoloration in the left lower extremity. (Tr. 431-35.)  The results of the study showed evidence of small vessel disease of the first, second and third toes of the left foot.  (Tr. 431.)

Plaintiff returned to Dr. Holscher on April 15, 2002, and requested that she be switched to Paxil from Effexor inasmuch as she continued to have social anxiety.  Plaintiff also reported left shoulder pain.  Dr. Holscher noted the symptoms of plaintiff's left foot to have improved.  Dr. Holscher noted plaintiff's conditions to be stable, and plaintiff was instructed to return in two months. (Tr. 379.)

On June 26, 2002, plaintiff reported to Dr. Holscher's office that she was pleased with Effexor.  Plaintiff reported that she still feels a bit "spacey" at times but that she has less social anxiety.  (Tr. 377.)

On July 18, 2002, plaintiff reported to Dr. Holscher's office that she was traveling to Missouri for a three-month trip and requested refills for the trip.  It was recommended that plaintiff begin Wellbutrin[22] but plaintiff wished to complete her trip first.  Plaintiff was given refills of Foradil, Advair,[23]

---

[22]Wellbutrin is indicated for the treatment of depression. Physicians' Desk Reference 1485-86 (55th ed. 2001).

[23]Foradil and Advair are used to treat wheezing, shortness of breath, and breathing difficulties caused by asthma and chronic

Vicodin, and Xanax.  (Tr. 372.)

Plaintiff visited Dr. D'Adrienne Jones of the Southern Illinois Healthcare Foundation on November 13, 2002, who noted plaintiff to have recently moved to the area.  (Tr. 364-65.)  Dr. Jones noted plaintiff's history of hypertension, asthma, depression, and allergies, and noted that plaintiff ran out of Effexor, Lipitor[24] and Singulair.  Plaintiff was given refills of the medications and was instructed to continue with Plendil.  (Tr. 365.)

Plaintiff returned to Dr. Jones on November 21, 2002, for follow up.  Plaintiff complained of jitteriness and sweaty palms.  Dr. Jones determined to rule out hyperthyroidism.  Plaintiff reported to Dr. Jones that she had recently moved from California and that her husband had been imprisoned for sexually molesting her children.  Plaintiff reported that her husband had impregnated her daughter.  Plaintiff was diagnosed with depression, which was noted to be stable.  Plaintiff was instructed to continue on her current medications.  (Tr. 363.)

Plaintiff reported to Dr. Jones on December 16, 2002, that she feels very nervous when she comes to the doctor.  Dr. Jones diagnosed plaintiff with hypertension under fair control, and

_____

obstructive pulmonary disease (COPD).  <u>Medline Plus</u> (last revised Oct. 1, 2006)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a602023.html>; <u>Medline Plus</u> (last revised July 1, 2006)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699063.html>.

[24]Lipitor is indicated for the regulation of cholesterol levels in the bloodstream.  <u>Physicians' Desk Reference</u> 2442-43 (55th ed. 2001).

depression-stable. Plaintiff was instructed to continue with her current medications. (Tr. 362.)

On February 5, 2003, plaintiff reported to Dr. Jones that she ran out of her medications and that she was completing forms for pharmaceutical assistance. Plaintiff's asthma and depression were noted to be stable. Plaintiff's hypertension was noted not to be controlled. HCTZ[25] was added to plaintiff's medication regimen. (Tr. 361.)

On April 30, 2003, plaintiff underwent a consultative psychological evaluation and IQ assessment for Disability Determinations. (Tr. 368-70.) Dr. Stephen D. Vincent noted plaintiff to have recently moved from California and to report difficulty with reading and writing. Plaintiff reported a history of anxiety and depression and reported feeling emotionally impoverished, having been ostracized by her family in California. Dr. Vincent noted plaintiff not to currently be participating in any counseling or seeing a psychiatrist. (Tr. 368.) Plaintiff reported that her sleep is poor and that she has dreams of her husband getting out of jail and hurting her children again. Plaintiff reported that her husband had a history of sexually molesting her children. Plaintiff reported that she currently lived with her mother and stepfather, but that her stepfather had made inappropriate sexual advances toward her, which made her uncomfortable. Mental status examination showed plaintiff to be

_____

[25]HCTZ (Hydrochlorothiazide) is indicated for the treatment of hypertension. Physicians' Desk Reference 2417-18 (55th ed. 2001).

oriented to time, place, person, and situation.  Plaintiff's speech was of adequate production, with normal rate and volume. Plaintiff's mood and affect were noted to be moderately depressed. Plaintiff was noted to be tearful throughout the examination. Plaintiff's thought processes were noted to be logical, coherent and fair, yet rather concrete, which Dr. Vincent noted to be consistent with plaintiff's IQ scores which placed plaintiff within the borderline to mildly mentally retarded range of intellectual abilities.  Plaintiff's IQ scores were measured to be verbal-65, performance-73, full scale-65.  (Tr. 369.)  Dr. Vincent considered plaintiff's IQ scores to be reliable, valid and consistent with her clinical presentation, limited formal education and essential functional illiteracy.  Dr. Vincent diagnosed plaintiff with major depression-recurrent and borderline intellectual functioning.  (Tr. 370.)

On June 16, 2003, Dr. Jones noted plaintiff to be dyslexic[26] and that plaintiff was requesting disability.  Plaintiff was prescribed Paxil[27] for anxiety.  (Tr. 360.)

On August 5, 2003, plaintiff visited Dr. Briccio S. Cadiz, III, at County Wide Internal Medicine, P.C., in Festus, Missouri, for medication refills and "to get acquainted."

---

[26]Dyslexia is an "[i]mpaired reading ability with a competence level below that expected on the basis of the individual's level of intelligence, and in the presence of normal vision and letter recognition and normal recognition of the meaning of pictures and objects."  Stedman's Medical Dictionary 532 (26th ed. 1995).

[27]Paxil is indicated for the treatment of depression. Physicians' Desk Reference 3114-15 (55th ed. 2001).

Plaintiff's medical history was noted. Upon physical examination, plaintiff was diagnosed with mild, intermittent asthma; hyperlipidia; left shoulder tendinitis; constipation; insomnia; and hypertension. Plaintiff was prescribed Neurontin[28] and Ultracet.[29] (Tr. 354.)

On September 2, 2003, plaintiff complained to Dr. Cadiz of fatigue, pain in both legs and chest pain. Plaintiff's medications were adjusted. (Tr. 353.) A stress echocardiography performed September 10, 2003, showed mild concentric left ventricular hypertrophy at rest and mild inferior hypokinesis at peak exercise. (Tr. 350-51.)

A pulmonary function study performed on October 29, 2003, was consistent with mild airway obstruction. Plaintiff was diagnosed with asthma and COPD. (Tr. 312-13.)

X-rays taken of plaintiff's right knee on October 29, 2003, were negative. X-rays taken of plaintiff's left shoulder showed calcific tendinitis. (Tr. 308.)

Plaintiff visited Psychiatrist Mario L. Carrera on November 13, 2003, for a psychiatric evaluation. (Tr. 342-44.) Dr. Carrera noted plaintiff's medications to include Clonazepam,[30]

---

[28]Neurontin is used to relieve the pain of post-herpetic neuralgia, i.e., pain after "shingles." Medline Plus (last revised July 1, 2006)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694007.html>.

[29]Ultracet is used to relieve moderate to moderately severe pain. Medline Plus (last revised Mar. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html>.

[30]Clonazepam is indicated for the treatment of seizure disorders and panic disorders. Physicians' Desk Reference 2759

Bupropion,[31] Effexor, Alprazolam,[32] and Hydrocodone.[33] Plaintiff
reported to Dr. Carrera that she was "getting crazy because . . .
[her] husband has been molesting [her] child, and now [her]
granddaughter is his daughter." (Tr. 342.) Plaintiff reported
that her husband was presently incarcerated. Plaintiff reported
that she cannot read or write, has generalized anxiety, and has no
motivation to do anything. Plaintiff reported that her children
blame her for her husband's behavior and that she cries often and
has no money. (Tr. 342.) Plaintiff reported that she has been
able to cope with her problems while on Effexor first prescribed by
Dr. Holscher. Plaintiff reported her condition to have worsened
during the previous month and that she feels unable to function.
Plaintiff reported being neglected as a child and that she was
molested by her step-father when she was eight years of age. Dr.
Carrera noted plaintiff to have a lot of anxiety and crying, with
some histrionic and depressive features. Plaintiff reported that
she hears voices, such as her daughter calling her name. Plaintiff
had no suicidal or homicidal thoughts or ideas. (Tr. 343.) Dr.
Carrera opined that plaintiff's level of functioning and level of
intelligence seemed, at best, in the low normal range. Dr. Carrera

---

(55th ed. 2001).

[31]Buproprion is marketed under the name "Wellbutrin."
Physicians' Desk Reference 1485 (55th ed. 2001).

[32]Alprazolam is marketed under the name "Xanax." Physicians'
Desk Reference 2650 (55th ed. 2001).

[33]Hydrocodone is marketed under the name of Vicodin.
Physicians' Desk Reference 1629 (55th ed. 2001).

recommended that plaintiff undergo IQ testing. Dr. Carrera diagnosed plaintiff with depression, chronic and recurrent; generalized anxiety; and possible dependency on pain killers. Dr. Carrera determined plaintiff's stressors to be significant and measured plaintiff's GAF to be 55. Dr. Carrera recommended that plaintiff come for counseling. (Tr. 344.)

Plaintiff visited Psychiatrist Ronald L. Beach on December 31, 2003, and reported that she sees a counselor every two weeks and obtains medications from Dr. Cadiz. Plaintiff reported her current medications to be effective. Dr. Beach noted plaintiff to be alert and oriented with spontaneous and coherent speech. Plaintiff displayed no gross evidence of a thought disorder and denied delusions and hallucinations. Plaintiff reported frequent anxiety and confusion. Plaintiff was noted to have adequate memory and recall. Plaintiff denied feelings of hopelessness as well as thoughts of suicide or homicide. Dr. Beach diagnosed plaintiff with depressive disorder-NOS, generalized anxiety disorder, rule out opioid dependence, and rule out personality disorder-NOS. Dr. Beach noted plaintiff to be illiterate due to her fifth grade education and that she had been separated from her primary support group. Dr. Beach assigned plaintiff a GAF score of 45 and instructed plaintiff to continue with counseling. (Tr. 341.)

On January 15, 2004, Dr. Cadiz completed a Physical Medical Source Statement in which he noted plaintiff's current diagnoses to be degenerative joint disease of the lumbar and knees, shoulder calcifate tendinitis, COPD, and asthma. (Tr. 346-49.)

Dr. Cadiz opined that plaintiff could sit, stand and walk for two hours out of an eight-hour work day. (Tr. 346.) Dr. Cadiz opined that plaintiff could continuously lift and carry one to two pounds; could frequently lift and carry five pounds; could occasionally lift and carry ten to twenty pounds; and could never lift or carry twenty-five pounds. Dr. Cadiz opined that plaintiff had significant limitations in handling and working with small objects with her left hand. (Tr. 347.) Dr. Cadiz reported that plaintiff was limited in balancing and could occasionally stoop and reach above her head. Dr. Cadiz reported that plaintiff could frequently tolerate exposure to dust, odors and noise. Dr. Cadiz reported that plaintiff's conditions cause her to experience pain all day as observed by reduced range of motion and motor disruption. (Tr. 348.) Dr. Cadiz opined that plaintiff should use a cane and that she would be required to take a break every two hours during an eight-hour work day inasmuch as prolonged standing or sitting results in back pain. Dr. Cadiz opined that plaintiff should not work full time due to her physical conditions. (Tr. 349.)

Plaintiff returned to Dr. Beach on February 18, 2004. (Tr. 340.) Plaintiff requested that her medication be managed by a psychiatrist rather than her primary care physician. Plaintiff reported that Effexor had not been working and she requested a different antidepressant. Plaintiff reported that she had been more angry during the day. Dr. Beach determined to prescribe a low

dosage of Sinequan[34] and to taper the Effexor. Mental status examination showed plaintiff to be alert and oriented with spontaneous and coherent speech. Plaintiff displayed no gross evidence of a thought disorder and denied delusions and hallucinations. Plaintiff was noted to have adequate memory and recall. Plaintiff denied feelings of hopelessness as well as thoughts of suicide or homicide. Dr. Beach continued in his diagnoses of plaintiff and prescribed Doxepin, Bupropion and Clonazepam. Plaintiff was instructed to return in four to six weeks. (Tr. 341.)

Plaintiff visited Therapist Agnes Jos at Comtrea Community Treatment Center on February 19, 2004. Plaintiff reported that she had been feeling very down and was very tearful during the week. Plaintiff denied any suicidal ideations but admitted to hoping that physical screening tests would come back positive. (Tr. 289.)

On March 4, 2004, plaintiff reported to Therapist Jos that she had been placed under a great deal of stress in that her mother has now come to live with her, her uncle and her grandmother, and that as a result she is required to meet many demands such as cooking, cleaning and monitoring medications. Plaintiff reported having communicated with her daughter. Therapist Jos worked with plaintiff on relaxation techniques. (Tr. 288.)

---

[34]Sinequan (Doxepin) is recommended for the treatment of psychoneurotic patients with depression and/or anxiety. Physicians' Desk Reference 2515 (55th ed. 2001).

On March 18, 2004, plaintiff reported to Therapist Jos that she has had anger episodes and has been staying in the basement in isolation. Plaintiff reported that she wanted to move to Florida once she was granted disability. Plaintiff expressed frustration at the delay in the disability hearing process. Plaintiff reported that she continues to be depressed and has not had a lot of energy recently to engage in her activities of designing aprons and doing puzzles. (Tr. 287.)

Plaintiff returned to Dr. Beach on March 31, 2004, and reported that she could not tolerate the Doxepin due to excessive sweating, but that such problem resolved once she stopped taking the medication. Plaintiff reported that she was doing well except that she does not sleep well at night. Mental status examination revealed no change since her last appointment. Dr. Beach continued in his diagnoses of plaintiff and prescribed Atarax,[35] Bupropion and Clonazepam. Plaintiff was instructed to return in six to eight weeks. (Tr. 339.)

On April 1, 2004, plaintiff reported to Therapist Jos that she continues to keep herself away from others to avoid conflict. Plaintiff also reported continued telephone contact with her daughter. Plaintiff reported feeling unappreciated and being treated by others as though she had no feelings. (Tr. 286.)

On April 16, 2004, plaintiff reported to Therapist Jos

[35]Atarax is indicated for the symptomatic relief of anxiety and tension associated with psychoneurosis and as an adjunct in organic disease states in which anxiety is manifested. Physicians' Desk Reference 2473 (55th ed. 2001).

that she had had a good week and was in a good mood. Therapist Jos noted plaintiff to be doing much better than in previous weeks. Plaintiff reported that she had been working on crafts from her grandchildren and continues to communicate with her daughter. (Tr. 285.)

On April 23, 2004, plaintiff complained to Dr. Cadiz that she could not sleep and that she hurt all over. Plaintiff reported that she no longer took Effexor and she informed Dr. Cadiz of the medications prescribed by Dr. Beach. Dr. Cadiz diagnosed plaintiff with degenerative joint disease of the knees, irritable bowel syndrome, and sinusitis. Wellbutrin was added to plaintiff's medication regimen. (Tr. 336.)

On April 29, 2004, plaintiff reported to Therapist Jos that she was very unhappy with her current life situation. Plaintiff was very tearful throughout the session. (Tr. 284.)

Plaintiff returned to Dr. Beach on May 12, 2004, and reported that Atarax had not helped with her sleep. Mental status examination revealed no change since her last appointment. Dr. Beach diagnosed plaintiff with depressive disorder-NOS, anxiety disorder-NOS, rule out opioid dependence, and rule out personality disorder-NOS. Dr. Beach prescribed Ambien, Bupropion and Doxepin. Plaintiff was instructed to return in six to eight weeks. (Tr. 332.)

On May 27, 2004, plaintiff visited Therapist Jos and reported having passive suicidal ideations but no plan. Plaintiff reported isolating herself in the basement but that she gets out

almost daily to take walks. Therapist Jos observed plaintiff to be very depressed, tearful and focusing on the negative in her life. Group counseling was suggested. (Tr. 282.)

On June 9, 2004, plaintiff reported to Dr. Beach that she had no energy or interest in doing things and that she had been thinking about suicide with plans of overdosing. Plaintiff agreed to seek inpatient treatment if her depression intensified. Dr. Beach determined to increase plaintiff's dosage of Doxepin. Mental status examination revealed no change since her last appointment. Dr. Beach continued in his diagnoses of plaintiff and instructed her to continue with her medications. (Tr. 331.)

On June 24, 2004, Therapist Jos noted that plaintiff appeared to be doing better but that she continued to appear somewhat depressed. It was noted that plaintiff did some cross-stitching to pass the time and also continued to prepare family meals. Plaintiff reported wanting to question her daughter as to why she waited so long to report her father's behavior, and Therapist Jos discussed possible consequences of such inquiries. (Tr. 280.)

On July 23, 2004, plaintiff complained to Dr. Cadiz of mood swings and sleep disturbance, and of pain in her left shoulder. Dr. Cadiz questioned whether plaintiff had a tear of the rotator cuff. Dr. Cadiz determined to order an MRI of the shoulder, and Skelaxin[36] was prescribed. (Tr. 335.)

---

[36]Skelaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions. Physicians' Desk

Plaintiff returned to Dr. Beach on July 28, 2004, and reported that she had not been okay. Plaintiff reported that she stayed with her sister for a few days after her last visit rather than go to the hospital, and that this helped a lot. Plaintiff reported that she stayed in the basement where she could avoid talking with people. Plaintiff reported that she feels her medications are not helping because she is angry and very irritable. Plaintiff reported that she would feel less depressed if her medications were more effective. Plaintiff reported that she was not sleeping well. Dr. Beach determined to discontinue Doxepin and Bupropion and to resume Effexor for depression and poor concentration. Seroquel[37] was prescribed for sleep and irritability. (Tr. 330.)

On August 5, 2004, plaintiff reported to Therapist Jos that she had been keeping her temper "under wraps" and Therapist Jos noted plaintiff to be in a positive mood. Plaintiff continued to work on craft projects and had reduced the amount of work she does for her grandmother, stating that she felt her grandmother was capable of doing things on her own. (Tr. 277.)

An MRI taken of plaintiff's left shoulder on August 18, 2004, showed degenerative change of the acromioclavicular joint, biceps tendinitis, probable tear in the inferior aspect of the anterior labrum, and evidence of partial tear and probably

---

Reference 1080 (55th ed. 2001).

[37]Seroquel is indicated for the management of the manifestations of psychotic disorders. Physicians' Desk Reference 639-40 (55th ed. 2001).

tendonopathy in the supraspinatus tendon.  (Tr. 297.)

On September 2, 2004, plaintiff reported to Therapist Jos that she isolates herself in the basement and no longer goes out. Plaintiff reported that she has not been sleeping, and that she is troubled by her children's difficulties.  Plaintiff reported that she stopped taking Seroquel because it made her too anxious. Plaintiff was tearful during the session but denied suicidal ideations.  (Tr. 275.)

Plaintiff returned to Dr. Beach on September 8, 2004, and reported that she continues to have difficulties due to her children.  Plaintiff reported no problems with her medications after adjustment.  Dr. Beach continued in his diagnoses of plaintiff and plaintiff was instructed to continue with her medications.  (Tr. 329.)

On September 16, 2004, plaintiff reported to Therapist Jos that she had been compliant with her medications and was sleeping better.  Therapist Jos noted plaintiff to have been socializing.  (Tr. 274.)

On October 14, 2004, plaintiff reported to Therapist Jos that she felt her home was in California and that she planned to return there permanently.  Plaintiff reported that her grandmother had a helper coming to the house which helped ease things for plaintiff.  Plaintiff reported that she was compliant with her medications.  Plaintiff became tearful when discussing her ex-husband.  (Tr. 272.)

On October 20, 2004, plaintiff reported to Dr. Beach that

she was doing "okay," "considering." Plaintiff admitted to low mood but denied anxiety. Plaintiff reported that she increased her dosage of Seroquel to help her sleep. Plaintiff denied any side effects from her medications. Dr. Beach noted there to be little evidence of change in plaintiff's mental status. Dr. Beach diagnosed plaintiff with generalized anxiety disorder as well as his previous diagnoses of depressive disorder-NOS, anxiety disorder-NOS, rule out opioid dependence, and rule out personality disorder-NOS. Plaintiff's dosage of Seroquel was increased. (Tr. 328.)

On October 26, 2004, plaintiff reported to Dr. Cadiz that Dr. Beach had taken plaintiff off of Wellbutrin and had prescribed Seroquel and Effexor. Dr. Cadiz diagnosed plaintiff with irritable bowel syndrome, allergic rhinitis, hypertension, hot flashes, and PMS. (Tr. 334.)

On November 11, 2004, plaintiff expressed her concerns to Therapist Jos regarding her grandmother's health. Plaintiff reported that she vents her frustrations while walking. (Tr. 271.)

Plaintiff returned to Dr. Beach on December 1, 2004, and reported that she had not been doing well during the previous month. Plaintiff reported that she had less energy and motivation and reported many relationship issues. Dr. Beach advised plaintiff that medication would not likely change plaintiff's situation with her over-involvement in relatives' problems. Dr. Beach determined

to taper plaintiff from Effexor and to begin Lexapro.[38]  Plaintiff
was instructed to continue with Seroquel.  (Tr. 327.)

On December 7, 2004, plaintiff underwent evaluation for
out-patient physical therapy.  (Tr. 293-94.)  Range of motion was
noted to be within normal limits, but plaintiff complained of
stiffness overall.  Left shoulder strength was within normal
limits.  Strength of the knees bilaterally was 4/5.  Upon physical
examination, plaintiff was assessed as having left shoulder pain,
and bilateral knee pain idiopathic in nature.  It was determined
that plaintiff would benefit from physical therapy and a home
exercise program.  (Tr. 294.)  Lower extremity and stability
exercises were begun, as well as upper extremity range of motion
exercises.  (Tr. 292.)

### IV.  The ALJ's Decision

The ALJ found that plaintiff met the nondisability
requirements for a period of disability and DIB and was insured for
benefits through the date of the decision.  The ALJ also found that
plaintiff had not engaged in substantial gainful activity since the
alleged onset date of disability.  The ALJ found plaintiff's
asthma, tendinitis of the shoulder, and borderline intellectual
functioning to be severe impairments (Tr. 20), but that such
impairments did not meet or medically equal any impairment listed
in Appendix 1, Subpart P, Regulations No. 4.  The ALJ also found
plaintiff not to be totally credible.  The ALJ found plaintiff to

---

[38]Lexapro is used to treat depression and generalized anxiety
disorder.  <u>Medline Plus</u> (last revised Jan. 1, 2007)<http://
www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603005.html>.

have the residual functional capacity to perform less than the full range of sedentary work. The ALJ determined that plaintiff's past relevant work as a cashier did not require performance of work-related activities which were precluded by plaintiff's limitations. As such, the ALJ determined that plaintiff could perform her past relevant work and concluded that plaintiff was not under a disability at any time through the date of the decision. (Tr. 25.)

## V. Discussion

As an initial matter, the undersigned notes that in her Brief in Support of the Complaint, plaintiff avers that the Social Security Administration awarded her disability benefits on a subsequently-filed application and established the onset date of plaintiff's disability to be July 30, 2005. As such, the instant appeal concerns only the time period from the alleged onset date of disability through the date of the ALJ's decision here, that is, July 29, 2005.

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§

423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and

becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent

conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome. <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole and, specifically, that the ALJ erred in his finding that plaintiff's impairments did not meet or medically equal Listing 12.05C – Mental Retardation.

The introductory paragraph to Listing 12.05 provides the diagnostic description for mental retardation: "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05 (2005). Listing 12.05 also contains four sets of criteria (paragraphs A through D). If a claimant's impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, the impairment meets the Listing. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 (2005).

Plaintiff argues that she meets or equals the criteria set out under paragraph C of Listing 12.05. To meet the listing level severity for mental retardation under Listing 12.05C, a

claimant must have "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05C (2005). A formal diagnosis of mental retardation is not required to meet Listing 12.05C. Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006). Instead, to meet Listing 12.05C, a claimant need only show: "(1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." Maresh, 438 F.3d at 899.

In his written decision, the ALJ determined plaintiff's condition not to meet or medically equal Listing 12.05C, finding specifically that plaintiff's listing level IQ scores as measured by Dr. Vincent were not valid. As such, in the absence of valid IQ scores of listing level severity, the ALJ did not undergo any analysis as to whether the onset of plaintiff's impairment occurred before she attained age twenty-two, or whether plaintiff had a physical or other mental impairment imposing an additional and significant work-related limitation of function, which, with an IQ score between 60 and 70, would bring her within the definition of Listing 12.05C. For the following reasons, the ALJ erred in this determination.

A.   IQ Scores

The Commissioner is not required to accept a claimant's

IQ scores and may reject scores that are inconsistent with the record. <u>Miles v. Barnhart</u>, 374 F.3d 694, 699 (8th Cir. 2004). "Indeed, test results of this sort should be examined to assure consistency with daily activities and behavior." <u>Id.</u> (internal quotation marks and citation omitted). Nevertheless, the Court must determine whether an ALJ's decision to disregard a claimant's IQ scores as unreliable is supported by substantial evidence on the record as a whole. <u>Clark v. Apfel</u>, 141 F.3d 1253, 1255 (8th Cir. 1998). Modest functional abilities are not inconsistent with a low IQ score. <u>See</u> <u>Brown v. Secretary of Health & Human Servs.</u>, 948 F.2d 268 (8th Cir. 1991).

In the instant case, the ALJ determined plaintiff to be functioning at a higher intellectual level than her IQ scores indicated:

> The undersigned notes that Dr. Vincent found the claimant was functioning at the borderline intellectual functioning level. He implied that her WAIS verbal and full scale IQ scores were not accurate and that she was functioning at a higher level. He noted that her effort was only fair. The conclusion is based on the fact that the DSM IV defines borderline intellectual functioning as in the 71 - 84 IQ range and that mental retardation is an IQ of 70 or below.

(Tr. 21.)

The ALJ's reading of Dr. Vincent's report is factually incorrect. Indeed, contrary to the ALJ's findings, Dr. Vincent expressly opined in his written report that plaintiff's IQ scores were to be considered reliable and valid:

At the present time Mary is functioning within the borderline to mildly mentally retarded range of intellectual abilities, with her scores at this time indicating some slight scatter within and between subset domains, with her verbal scores indicating weaknesses on tasks measuring her logical abstract categorical thinking (similarities), as well as mathematical reasoning skills and her awareness of social standards and common sense expectations and ability to learn from past experiences (comprehension). Relative strengths were found on tasks measuring short-term auditory memory (digit-span). Nonverbal problem solving skills all fell within the borderline range, with deficits noted on tasks measured by block design, which is an assessment of her ability to analyze whole/part relationships and understand figure/ground separation, as well as digit symbol, which is a measure of speed of mental operation and use of short-term visual memory and her capacity to learn a new visual motor task quickly and accurately. She fell within the low end of the average range on picture completion, which is a measure of her ability to visually differentiate between essential and nonessential aspects of an item. *To the extent her limits would allow these data are considered to be reliable and valid and consistent with her clinical presentation and aforementioned limited formal education and essential functional illiteracy.*

(Tr. 369-70.) (Emphasis added.)

The Regulations recognize that standardized intelligence tests may provide data to help verify the presence of mental retardation. 20 C.F.R., Part 404, Subpart P, App. 1, § 12.00D(6)(a) (2005). Although the Regulations specifically endorse the use of the Wechsler Adult Intelligence Scale (WAIS) for such testing, see 20 C.F.R., Part 404, Subpart P, App. 1, § 12.00D(6)(c) (2005); Cook v. Bowen, 797 F.2d 687, 690 n.2 (8th Cir. 1986), they

- 39 -

nevertheless suggest that "the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." 20 C.F.R., Part 404, Subpart P, App. 1, § 12.00D(6)(a) (2005). This is precisely what Dr. Vincent did here. Unlike the claimant in <u>Clay v. Barnhart</u>, 417 F.3d 922 (8th Cir. 2005), the plaintiff here demonstrated no evidence of malingering during the IQ testing nor provided responses which would render Dr. Vincent's conclusions based thereon equivocal. Indeed, seven months subsequent to this testing, plaintiff's psychiatrist recommended that plaintiff undergo IQ testing, noting specifically that plaintiff's level of functioning and level of intelligence seemed, "at best," in the low normal range. There was no evidence of malingering on plaintiff's part during this psychiatric evaluation such that this psychiatrist's recommendation that plaintiff undergo IQ testing would be rendered suspect. <u>See</u>, <u>e.g.</u>, <u>Clay</u>, 417 F.3d at 929 (no suggestion that claimant was malingering or feigning mental infirmity at time of psychiatrist's examination).

The ALJ also discredits plaintiff's IQ scores on the basis that her efforts during the testing were only "fair." This additional reason to discredit the scores fails to adequately consider the fact that Dr. Vincent also took this into consideration, as well as plaintiff's activities, when he formed his expert opinion that plaintiff's IQ scores were valid. <u>See</u> <u>Chunn v. Barnhart</u>, 397 F.3d 667, 672 (8th Cir. 2005).

To further discredit plaintiff's IQ scores, the ALJ found it significant that Dr. Vincent's final diagnosis of plaintiff was that she suffered from borderline intellectual functioning rather than mental retardation. Such diagnosis, the ALJ reasoned, implied that Dr. Vincent did not find plaintiff's verbal and full scale IQ scores of 65 to be accurate inasmuch as the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), defines borderline intellectual functioning as in the 71-84 IQ range and that mental retardation is in the IQ range of 70 or below. (Tr. 19, 21.) As noted by the Eighth Circuit in <u>Maresh</u>, however, "[i]n revising the Listings of Impairments in 2002, the Commissioner *rejected* a proposal that the DSM's definition [of mental retardation] be used for Listing 12.05." <u>Maresh</u>, 438 F.3d at 899 (citing 67 Fed. Reg. 20,022) (emphasis added). For the ALJ to define mental retardation by using a standard expressly rejected by the Commissioner was error. Indeed, as noted above, a formal diagnosis of mental retardation is not required to meet Listing 12.05C. <u>Id.</u> As such, in the face of IQ scores found by an expert to be "reliable and valid," and "consistent with [plaintiff's] clinical presentation[,] . . . limited formal education and essential functional illiteracy," the ALJ erred in rejecting such scores on the basis of Dr. Vincent's lack of formal diagnosis of mental retardation and in reliance upon the DSM-IV's definition of mental retardation and borderline intellectual functioning.

Finally, substantial evidence fails to support the ALJ's determination to discount plaintiff's IQ scores on the basis of

plaintiff's behavior and daily activities. While the ALJ found plaintiff able to care for her mother and grandmother, perform household chores, cook, and visit with friends, such activities adequate for minimal self-support are not inconsistent with mild mental retardation. See, e.g., Brown, 948 F.2d at 269-270. In Clark v. Apfel, 141 F.3d 1253 (8th Cir. 1998), the Eighth Circuit held that an ALJ may reject recorded IQ scores if they are inconsistent with other evidence in the record, including the claimant's behavior and daily activities. Clark, 141 F.3d at 1255. However, in Clark, the record as a whole failed to support the claimant's low IQ scores, with the Eighth Circuit specifically noting that the claimant could read and write and count money; had a driver's license; did the majority of the cooking, cleaning and shopping for the household; was the primary caretaker for her young daughter; and had no other medical records which mentioned suspected intellectual impairment. Id. at 1256; see also Miles, 374 F.3d at 699 (claimant attended regular classes in high school, achieving "B" grades; completed vocational training; passed driver's license test and had driven a car; lived independently; never been terminated from a job for lack of mental ability). Unlike the claimants in Clark and Miles, the plaintiff here has significant difficulty with reading and writing and indeed lost employment on account thereof.[39]  Plaintiff has not attended school since the sixth grade and has engaged in no vocational training.

---

[39]Significantly, the employment plaintiff lost because of her inability to adequately read and write is the same employment to which the ALJ found plaintiff able to return.

Plaintiff cannot independently manage her own bank account and has been unable to obtain a driver's license. In the past, plaintiff relied on her daughter's assistance in completing employment applications and in taking employment-related tests, and indeed continues to similarly rely on the assistance of others as demonstrated by their completion of forms on plaintiff's behalf in relation to her pending applications for disability benefits. (See, e.g., Tr. 233, 242, 266.) Finally, contrary to the circumstances in Clark, other medical records show that plaintiff's level of intellectual functioning has been questioned by other health care providers. Therefore, although the record shows plaintiff to have engaged in cooking, cleaning and care giving at her home, the record also shows that such activities were not performed without a significant degree of difficulty and resulted in plaintiff's ultimate withdrawal and seclusion from all activities. As such, in view of the evidence contained in the entire record, plaintiff's performance of such limited activities is insufficient to constitute substantial evidence to support the ALJ's determination to discount plaintiff's otherwise valid IQ scores. Brown, 948 F.2d at 270.

For all of the foregoing reasons, there is not substantial evidence in the record to support the ALJ's rejection of plaintiff's IQ scores. Plaintiff has done what was required by the Regulations to submit valid IQ scores for consideration, and there is substantial evidence on the record as whole to support the validity of such scores. Accordingly, plaintiff's verbal and full

scale IQ scores of 65 should be considered valid and in satisfaction of the first prong of Listing 12.05C. See Brown, 948 F.2d at 270.

B.  Physical or Other Mental Impairment

To meet Listing 12.05C for mental retardation, a claimant must have a "physical or other mental impairment imposing an additional and significant work-related limitation of function." A physical or other mental impairment is sufficient to satisfy this part of the test when such impairment 'has a more than slight or minimal effect on [the claimant's] ability to perform work.'" Jones v. Barnhart, 335 F.3d 697, 699 (8th Cir. 2003) (quoting Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000); Cook v. Bowen, 797 F.2d 687, 690 (8th Cir. 1986)). If the additional impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)[,]" the impairment will be considered to satisfy the second prong of Listing 12.05C. 20 C.F.R., Part 404, Subpart P, App. 1, § 12.00A (2005); Cook, 797 F.2d at 690-91. The additional limitation must arise from an impairment distinct from the claimant's mental retardation and not be mere manifestations or symptoms thereof. Buckner, 213 F.3d at 1012.

At step two of the sequential evaluation here, conducted pursuant to 20 C.F.R. §§ 404.1520 and 416.920 (see Tr. 16), the ALJ found plaintiff's asthma and tendinitis of the shoulder to be severe impairments within the meaning of the Regulations. (Tr.

- 44 -

20.)[40]  Inasmuch as the ALJ found these physical impairments to be
"severe," that is, that they significantly limited plaintiff's
physical or mental ability to do basic work activities under §§
404.1520 and 416.920, they necessarily impose an additional and
significant work-related limitation of function to bring such
impairments within the second prong of Listing 12.05C.  20 C.F.R.,
Part 404, Subpart P, App. 1, § 12.00A (2005); Cook, 797 F.2d at
690-91.[41]

        Accordingly, plaintiff's impairments of asthma and
tendinitis of the shoulder, determined to be severe under the
Regulations, should be considered to satisfy the second prong of
Listing 12.05C.

C.    Onset Before Age 22

        To meet Listing 12.05C, a claimant must not only satisfy
the two prongs of paragraph C, but must also demonstrate an onset
of the intellectual impairment before age twenty-two.  Maresh, 438
F.3d at 889.  Plaintiff's IQ scores were measured in April 2003
when plaintiff was forty-three years of age.[42]  Although these

        [40]Plaintiff's level of intellectual functioning was also found
by the ALJ to be a severe impairment.  (Tr. 20.)  However, this
impairment cannot be considered another mental impairment imposing
additional limitations to satisfy the second prong of Listing
12.05C.  Buckner, 213 F.3d at 1012.

        [41]The undersigned notes that in an unpublished opinion, Owens
v. Shalala, 52 F.3d 330 (8th Cir. 1995) (table), the Eighth Circuit
remanded the case to the Commissioner due to the Commissioner's
findings that claimant's physical condition was "severe" but did
not impose a significant work-related limitation of function under
the second prong of Listing 12.05C.  The Eighth Circuit considered
such findings to be inconsistent in light of Cook.

        [42]Plaintiff's birth date is October 28, 1959.  (Tr. 154.)

- 45 -

scores were recorded after the developmental period preceding age twenty-two, "a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in the claimant's intellectual functioning." Id. at 900 (internal quotation marks and citation omitted); see also Muncy v. Apfel, 247 F.3d 728, 734-35 (8th Cir. 2001).

In this cause, no evidence demonstrates a change in plaintiff's intellectual functioning to overcome the presumption that plaintiff's IQ scores represent her level of functioning prior to age twenty-two. A review of the record as a whole shows that plaintiff was held back in school a number of years during her elementary education. Plaintiff ultimately dropped out of school when she was sixteen years of age, but at that time she had reached only the sixth grade. Plaintiff reported that when she dropped out of school, she could not read or write and had difficulty understanding what was going on. Between then and the time of her applications for disability, plaintiff obtained employment, but with the assistance of her daughter in completing applications and taking required tests. Plaintiff lost employment because of her limited intellectual ability and has never obtained a driver's license. To date, plaintiff continues to require the assistance of others in completing forms and in performing daily tasks such as writing checks, reading mail, and traveling to the grocery store and to doctor's appointments. Further, in his examination of plaintiff, Dr. Vincent specifically noted plaintiff's limited formal education and functional illiteracy, observing plaintiff's

"situation [to be] further compromised by limited intellectual resources, which currently place her within the borderline range, which may certainly make it difficult for her to problem solve effectively and respond to unwanted thoughts and affect in stressful situations." (Tr. 370.)

Substantial evidence on the record shows plaintiff's functional illiteracy and limited intellectual resources to have been present prior to plaintiff's attainment of twenty-two years of age. Dr. Vincent expressly opined that plaintiff's IQ scores were consistent with such functional illiteracy and limited intellectual resources. Because there exists no evidence of a change in plaintiff's intellectual functioning since the age of twenty-two, it is presumed that plaintiff's IQ has remained stable over time. Maresh, 438 F.3d at 900. Accordingly, substantial evidence on the record as whole shows plaintiff's intellectual functioning to satisfy the diagnostic description in the introductory paragraph of Listing 12.05 in that the onset of such intellectual impairment occurred before plaintiff reached twenty-two years of age. See Muncy, 247 F.3d at 734-35, and cases cited therein.

The undersigned is aware that the ALJ did not address this issue inasmuch as he terminated the 12.05C analysis by erroneously finding plaintiff not to have a valid IQ score within the required range. However, as in Maresh, the record indicates that plaintiff's mental retardation initially manifested itself before age twenty-two. See Maresh, 438 F.3d at 900. As such, for all of the above stated reasons, "the ALJ should have found that

[plaintiff's] impairment manifested itself during [her] developmental period." Id. Accordingly, plaintiff's IQ scores, documented limited intellectual abilities, and deficits in adaptive functioning should be considered to satisfy the diagnostic description in the introductory paragraph of Listing 12.05 in that such impairment manifested itself prior to plaintiff reaching age twenty-two.[43]

## VI. Conclusion

For all of the foregoing reasons, the Commissioner's determination that plaintiff failed to meet the criteria of Listing 12.05C and was not entitled to benefits therefor was not supported by substantial evidence on the record as a whole. Because the record provides substantial evidence to find that plaintiff meets Listing 12.05C, it should be determined that plaintiff is conclusively disabled and entitled to benefits. Accordingly, the decision of the Commissioner should be reversed and the matter should be remanded to the Commissioner with instructions to award plaintiff benefits for the time period from the onset date of

---

[43]Although it may be relevant that plaintiff worked as a cashier presumably with the same cognitive abilities as she now possesses, it is likewise relevant that plaintiff was discharged from this employment because she could not adequately justify her voids, which, according to plaintiff, required her to write out her justifications – an act she lacked the intellectual capacity to perform. Nevertheless, if a claimant demonstrates that she meets or equals a listed impairment at the third step of the sequential evaluation, the claimant is determined to be disabled and no analysis as to whether the claimant can perform work is undertaken. See Maresh, 438 F.3d at 901 (citing Jones v. Barnhart, 335 F.3d 697, 699 (8th Cir. 2003)).

disability, that is, October 23, 2001,[44] through the date of the ALJ's decision here, that is, July 29, 2005. <u>Bailey v. Apfel</u>, 230 F.3d 1063 (8th Cir. 2000); <u>Cook</u>, 797 F.2d at 691.

Therefore,

**IT IS HEREBY RECOMMENDED** that Michael J. Astrue, Commissioner of Social Security, be substituted for former Commissioner Jo Anne B. Barnhart as proper party defendant in this cause.

**IT IS FURTHER RECOMMENDED** that the decision of the Commissioner be reversed and that the matter be remanded to the Commissioner for an award of benefits consistent with the opinion set out herein.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **June 29, 2007**. Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE

Dated this __18th__ day of June, 2007.

---

[44]The undersigned notes that in her applications for benefits, plaintiff alleged different onset dates of her disability. (Tr. 95-97, 154-56.) In her Brief in Support of the Complaint, plaintiff notes that she alleged an onset date of October 23, 2001. (Pltf.'s Brief at p.1.) In his written opinion, the ALJ noted this alleged onset date of October 23, 2001 (Tr. 15), and found plaintiff not to have engaged in substantial gainful activity since that time (Tr. 25). No objection has been raised to this finding.